**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:26-cv-80481-DMM**

GRILL RESCUE LLC d/b/a RESCUE LLC,

Plaintiff,

v.

SHENZHEN REEKOOS HOUSEWARE
CO. LTD, et al.,

Defendants.
_____________________________________/

**DEFENDANT FROST BUDDY LLC'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE JOHN PLUMPE AND FOR RELATED EXPEDITED DISCOVERY**

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. BACKGROUND FACTS .......... 2

III. ARGUMENT .......... 6

A. Legal Standards Governing Expert Witness Disqualification .......... 6

B. Grill Rescue Cannot Establish That It Had a Confidential Relationship with Mr. Plumpe or That It Was Objectively Reasonable to Believe Such a Confidential Relationship Existed With Mr. Plumpe .......... 8

1. Grill Rescue's Description of Its Interactions with Mr. Plumpe Does Not Prove the Existence of a Confidential Relationship or an Objectively Reasonable Belief That Such a Confidential Relationship Existed. .......... 8

2. Mr. Plumpe's Evidence Demonstrates That No Confidential Relationship Existed. .......... 10

C. Grill Rescue Has Not Shown, With the Required Specificity, That Confidential Information Was Actually Disclosed to Mr. Plumpe. .......... 14

D. Policy and Fairness Considerations Weigh Decisively Against Disqualification. .......... 17

1. Availability of Comparable Experts .......... 17

2. Disruption to the Litigation .......... 19

IV. CONCLUSION .......... 20

Defendant Frost Buddy LLC ("Frost Buddy"), by and through counsel, respectfully files its Opposition to Plaintiff Grill Rescue LLC's ("Grill Rescue") Motion to Strike Frost Buddy's Expert John Plumpe and for Related Expedited Discovery [D.E. 69], and states as follows:

## I. <u>INTRODUCTION</u>

Grill Rescue's Motion to Strike Frost Buddy's financial expert is extreme and unfounded. First, Grill Rescue's Motion seeks drastic relief contrary to the law Grill Rescue itself cites that would upend the schedule in this case after expert discovery (including Mr. Plumpe's deposition) has already been completed (the last day of expert discovery per the Court's schedule being today, November 16, 2026). Second, Grill Rescue's Motion sets forth undisputed facts based upon its own counsel's Declarations that establish Grill Rescue apparently strung Mr. Plumpe along for a "potential" and "prospective" engagement until September 14, 2026, a mere three days before Grill Rescue's expert disclosure deadline, never sending him a non-disclosure agreement, an engagement letter, or any information beyond the publicly filed Complaint, all the while apparently having a different expert behind the curtain to timely disclose on September 17, 2026, which it did in the form of Mr. Stephen Holzen's forty-four page expert report.

"Disqualification of an expert witness is a 'drastic remedy' and rarely granted." *Daddono v. Hoffman*, No. 8:21-cv-315-WFJ-MRM, 2022 WL 2802695, at *3 (M.D. Fla. July 18, 2022); *see also United States ex rel. Desrosiers v. Thaller*, No. 12-22445-CIV, 2016 WL 6441548, at *14 (S.D. Fla. Nov. 1, 2016) ("[d]isqualification [of an expert witness] is a drastic remedy that courts use sparingly"); *Culliver v. BP Expl. & Prod., Inc.*, No. 3:21CV4942-MCR-HTC, 2022 WL 19568967, at *1 (N.D. Fla. Oct. 13, 2022) ("disqualification of an expert witness is a 'drastic measure,' which courts should 'hesitantly, reluctantly, and rarely' impose."). Federal courts have based this position, in large part, on the rationale that "'[i]f experts are too easily subjected to disqualification,' attorneys and their clients may manufacture an 'inexpensive relationship with

potentially harmful experts solely to keep them' from being used against them by the opposing side." *Daddono*, 2022 WL 2802695, at *3 (quoting *Koch Ref. Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1183 (5th Cir. 1996)).

Grill Rescue's Motion asks this Court to take the drastic step of disqualification[1] based on nothing more than a preliminary, pre-engagement, and ultimately unconsummated courtship by Grill Rescue's counsel directed at Mr. Plumpe that never ripened into a retention, with only vague and conclusory assertions about what was supposedly discussed, the implications of which Mr. Plumpe vehemently denies. Southern District of Florida and Eleventh Circuit authority require far more to justify the rare and extreme action of disqualification. *See, e.g.*, *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1444–45 (11th Cir. 1998); *Thaller*, 2016 WL 6441548, at *14. For at least these reasons and those discussed more fully below, the Court should deny Grill Rescue's Motion in all respects.

## II. <u>BACKGROUND FACTS</u>

There are several, material undisputed facts before the Court, based upon Grill Rescue's own evidence, that support denial of Grill Rescue's Motion, including the following:

- Grill Rescue's attorneys first reached out to Mr. Plumpe on July 28, 2026, "writing to inquire about your availability to ***<u>potentially</u>*** serve as a damages expert on our behalf." *See* Ex. A to Frederick Decl. (emphasis added).

[1] Grill Rescue asks the Court to order expedited discovery, but Grill Rescue failed to inform the Court that it noticed Mr. Plumpe's deposition for November 13, 2026, and the deposition took place as noticed. In that deposition, Grill Rescue's counsel questioned Mr. Plumpe at length about the issues presented by Grill Rescue's Motion to Strike. Grill Rescue thus has already taken its opportunity to obtain discovery, rendering the request for expedited discovery moot.

- From the July 28, 2026 initial reach-out through Mr. Plumpe's September 14, 2026 email declining an engagement by Grill Rescue, Grill Rescue and Mr. Plumpe had a total of two conversations. *See* Wolek Decl. ¶¶ 8–9.
- On September 10, 2026, six weeks after initially contacting Mr. Plumpe and one week before Grill Rescue's deadline to disclose its experts in this case, Grill Rescue requested that Mr. Plumpe provide a budget to facilitate "***potentially*** assisting as an expert witness." *See* Wolek Decl., Ex. B (emphasis added).
- On September 14, 2026, three days before Grill Rescue's deadline to disclose its experts in this case, Grill Rescue was still in the process of seeking a "proposed budget" from Mr. Plumpe. *See* Wolek Decl., Ex. C.
- On September 14, 2026, Mr. Plumpe asked Grill Rescue's counsel to "remove [his] name from the list of experts being considered by Grill Rescue." *See* Plumpe Decl. ¶ 29 & Ex. 9; *see also* Wolek Decl. ¶ 14.
- At no time did Grill Rescue or its attorneys send a non-disclosure agreement, draft engagement letter, or any documentation to Mr. Plumpe other than the operative Complaint filed in the case, or ask him to perform any substantive analysis or create any work product. *See* Wolek Decl., *passim*; Frederick Decl., *passim*; Declaration of John Plumpe ("Plumpe Decl."), ¶¶ 10, 12–16.
- On September 17, 2026, Grill Rescue served its "expert report of Stephen Holzen in accordance with the Court's scheduling order." *See* Wolek Decl. ¶ 15.

In addition, material to the Court's analysis is the fact that Mr. Plumpe is currently a Managing Director at Epsilon Economics and has worked as an economic, litigation, valuation, and licensing consultant on intellectual property issues, with a specialized mechanical engineering

background, since 1999. *See* Plumpe Decl. ¶¶ 1, 3–4. In his twenty-seven years as a financial expert, he has had hundreds, if not thousands, of non-confidential telephone conversations and preliminary meetings regarding potential expert engagements, which are commonly about thirty minutes in length. *Id.* at ¶ 6. The two conversations Mr. Plumpe had with counsel for Grill Rescue on August 27 and August 28, 2026, were both approximately thirty minutes long but only the second conversation involved discussions of the instant case. *Id.* at ¶¶ 10–12. The other conversation was an introductory call regarding separate litigation pending in Illinois. *Id.* at ¶ 10. At no time during any communication between Grill Rescue's counsel and Mr. Plumpe, including the August 28 conversation, did Mr. Plumpe indicate he was treating the communications regarding this lawsuit as confidential or that he somehow had formed a confidential relationship with Grill Rescue simply because conflicts had been cleared, and neither did Grill Rescue's counsel. *Id.* at ¶¶ 14, 16–18. Further, Mr. Plumpe did not receive strategy, the strengths and weaknesses, procedural plans, any candid assessment of the facts or litigation positions related to this matter. *Id.* at ¶ 12. His recollection, as set forth in both his Declaration and sworn deposition testimony and informed by his notes of that call, is that there was a general discussion (as is the case in most of his preliminary calls) of the allegations in the Florida pleadings, the available categories of damages under the applicable statutes, the court's schedule for expert disclosures, and his experience in similar types of cases. *Id.* The discussions on August 28, 2026, were specifically confined to these non-confidential topics because, several minutes into the call, after being informed that counsel for Grill Rescue, Fox Rothschild, had not provided him with a copy of the operative complaint in this case, Grill Rescue's counsel sent Mr. Plumpe a copy of the First

Amended Complaint.[2] *Id.* Grill Rescue did not request a retainer or engagement letter from Mr. Plumpe during the August 28, 2026 conversation, or at any other time, and he did not hear from anyone at the Fox Rothschild firm again until September 10, 2026. *Id.* at ¶¶ 10, 12, 13, 26.

Mr. Plumpe did not conduct any analysis, formulate any opinions, log any time, request any payment, or send any proposed budget or engagement letter to the Fox Rothschild firm with respect to either the Illinois or Florida cases. *Id.* at ¶ 15. Mr. Plumpe did not share any work product with the Fox Rothschild firm, nor did they share any work product with Mr. Plumpe. *Id.* Grill Rescue's counsel did not ask Mr. Plumpe not to discuss the case with others, did not engage him to assist in either of the cases, did not supply him with specific data relevant to either case, and did not request that he perform any services. *Id.* Mr. Plumpe did not enter into a confidentiality agreement or non-disclosure agreement with the Fox Rothschild firm either on his own behalf or on behalf of Epsilon. *Id.* at ¶ 16.

Mr. Plumpe first received a call from counsel for Frost Buddy on September 2 or 3, 2026, based upon a referral from the Shutts & Bowen law firm, with whom Mr. Plumpe had recently completed a trial. *Id.* at ¶ 19; *see also* Declaration of Michael Hickey ("Hickey Decl."), ¶ 3. As the week proceeded into Labor Day weekend and knowing that Grill Rescue's expert disclosure deadline was September 17, 2026, and that he had not heard from Grill Rescue's attorneys after August 28, 2026, Mr. Plumpe reasonably assumed Grill Rescue had engaged another expert, and that, consistent with many other potential engagements that did not mature into actual engagements, Fox Rothschild had simply not informed him of their decision. Plumpe Decl. ¶ 24. Thus, on September 9, 2026, Epsilon sent Frost Buddy's counsel a signed engagement letter setting

[2] Mr. Plumpe is willing to submit his notes *in camera* if the Court so requests. *See* Plumpe Decl. ¶ 12.

forth the proposed terms of the engagement, including confidentiality provisions. *Id.* at ¶ 25; Hickey Decl. ¶ 6. Mr. Plumpe then went on a remote vacation, responding to Grill Rescue's September 10 budget request at 9:12am Central on September 11, before having received a fully executed engagement letter and retainer payment from Frost Buddy's counsel later that day. Plumpe Decl. ¶¶ 25–28. After returning from his trip, on September 14, 2026, Mr. Plumpe received Grill Rescue's follow-up budget request and declined the engagement with Grill Rescue. *Id.* at ¶ 29.

Grill Rescue also omits from its filing the important fact that, after it requested Frost Buddy withdraw Mr. Plumpe as an expert in this case, and Frost Buddy declined to do so in an email dated October 21, 2026, Grill Rescue nonetheless proceeded on October 30, 2026, to notice Mr. Plumpe for deposition. *See* Wolek Decl., Ex. E; Hickey Decl. ¶ 8. Grill Rescue did not again raise the issue of the purported conflict until November 4, 2026, but still proceeded with Mr. Plumpe's deposition on November 13, 2026, to the significant expense of Frost Buddy. Wolek Decl. ¶ 19; Hickey Decl. ¶ 10.

## III. <u>ARGUMENT</u>

### A. Legal Standards Governing Expert Witness Disqualification

Federal courts possess the inherent power to disqualify an expert witness. *See Koch*, 85 F.3d at 1181. "That power derives from the necessity to protect privileges which may be breached when an expert switches sides, and from the necessity to preserve public confidence in the fairness and integrity of judicial proceedings." *Thaller*, 2016 WL 6441548, at *14. However, that power is exercised sparingly because, *inter alia*, "[t]here is a recognized reluctance to disqualify expert witnesses who 'possess useful specialized knowledge'" and experts, unlike attorneys, "are not advocates in the litigation but are instead sources of information and opinion." *Id.* (citations omitted). There is no "blanket rule or policy" in this Circuit against "side-switching." *Indus. Risk*

*Insurers*, 141 F.3d at 1444–45. Moreover, the Eleventh Circuit has expressly limited the concept of "side-switching" to situations seeking to offer "testimony against a party's interest by an expert witness formerly ***retained*** by that party." *Id.* at 1444 (emphasis added).[3]

As a general rule, to determine whether disqualification of an expert is warranted, courts in this Circuit analyze: (1) whether the party seeking disqualification had a confidential relationship with the expert and/or whether it was objectively reasonable for the movant to conclude that such a confidential relationship existed between the movant and the expert; and (2) whether that party did, in fact, disclose confidential information to the expert. *See, e.g., Thaller*, 2016 WL 6441548, at *15; *Daddono*, 2022 WL 2802695, at *3. Only if the answers to the threshold inquiries are affirmative should the expert be disqualified – "disqualification should not occur where a confidential relationship existed but no privileged information was communicated, or where no confidential relationship existed but privileged information was nonetheless disclosed." *Thaller*, 2016 WL 6441548, at *14–15 (internal quotations omitted). Courts additionally weigh policy and fairness considerations, including the availability of an alternative expert witness and, where the challenge arises at a late stage of the litigation, the potential disruption to the proceedings. *See Glasser v. Hilton Grand Vacations Co.*, No. 8:16-cv-952-T-27AAS, 2017 WL 3584930, at *2 (M.D. Fla. July 24, 2017).

The party seeking disqualification bears the burden of establishing both the existence of a confidential relationship and the actual disclosure of confidential or privileged information, such that the expert should not be disqualified on anything less. *See id.* (citing *Thaller*, 2016 WL

[3] To the extent Grill Rescue implies there is any presumption against "side-switching" in this Circuit, said presumption is not applicable to this case because side-switching occurs only where an expert was actually retained before switching. It is undisputed here that Mr. Plumpe was never retained by Grill Rescue or its counsel.

6441548, at *15). Moreover, unlike attorney-client communications, discussions between parties or counsel and a prospective expert carry no presumption that confidential information was exchanged. *See Thaller*, 2016 WL 6441548, at *18.

### B. Grill Rescue Cannot Establish That It Had a Confidential Relationship with Mr. Plumpe or That It Was Objectively Reasonable to Believe Such a Confidential Relationship Existed With Mr. Plumpe.

#### *1. Grill Rescue's Description of Its Interactions with Mr. Plumpe Does Not Prove the Existence of a Confidential Relationship or an Objectively Reasonable Belief That Such a Confidential Relationship Existed.*

Counsel for Grill Rescue's own account of its dealings with Mr. Plumpe mirrors the precise pattern that courts in this Circuit have repeatedly found insufficient to create a confidential relationship or an objectively reasonable belief that such a confidential relationship existed.

For example, in *Daddono*, the court denied a motion to disqualify where the moving party's counsel had two substantive telephone conversations with the prospective expert, discussed a proposed retainer and hourly rate, exchanged a fee agreement and CV, and allegedly "shared additional information about counsel's views of the strengths and weaknesses of each parties' position, claims, and defenses and evaluation as to the evidence as it pertained to each, counsels' legal theories, and strategies and defenses thereto," but the expert was never formally retained, never received case materials, never submitted an invoice, and ultimately declined the engagement. *See Daddono*, 2022 WL 2802695, at *1–2. The court emphasized that "Plaintiff cannot identify or produce a confidentiality agreement executed by either party in this case… [Plaintiff's counsel] simply asked [expert] to forward his fee schedule and typical contract. There is no email confirming that [expert] was retained and would provide expert services on behalf of Plaintiff. The exchanged emails and the documents provided by [expert] are insufficient to solidify a confidential relationship." *Id.* at *3. The court also noted that, in addition to the absence of a written retention agreement or confidentiality agreement, the absence of any payment or invoices for the expert's

work on the case, the absence of any records or case materials provided to the expert, the fact that "the total sum of 'meetings' include[d] two telephone conversations," and the fact that the expert acted in conformance with his standard practice of not taking notes or logging time prior to accepting the engagement all militated against finding any relationship, confidential or otherwise, had been formed. *Id.* at *3–4. The court further noted that ***any ambiguity as to whether a confidential relationship existed should be resolved against the party claiming the relationship existed***. *Id.* at *3 (citing *De Palo v. Ludlam Retail Assocs., Ltd.*, No. 13-20323-Civ-Martinez/McCaliley, 2013 WL 12304736, at *2 (S.D. Fla. Sept. 9, 2013)).

In the instant dispute, Grill Rescue admits that its relationship with Mr. Plumpe was limited to: the Fox Rothschild firm contacting Mr. Plumpe to gauge interest, Mr. Plumpe running conflicts, one thirty-minute phone call on August 27, 2026, and one other virtual meeting of unidentified length the following day. *See* Wolek Decl. ¶¶ 5–10. However, there is no dispute that Grill Rescue never retained Mr. Plumpe. Grill Rescue does not purport to have executed an engagement letter with him, does not claim to have paid him a retainer, and does not claim to have provided him with any case documents or discovery materials for his review, beyond a copy of the publicly filed First Amended Complaint. When Grill Rescue's counsel contacted Mr. Plumpe in mid-September 2026 to request engagement budgets, Mr. Plumpe instead withdrew from consideration.

That sequence of events, analogous to the sequence in *Daddono*, reflects a preliminary courtship that never matured into a retention and never became a confidential relationship. *See Daddono*, 2022 WL 2802695, at *3–4. Moreover, it is not objectively reasonable to conclude otherwise merely because Mr. Plumpe cleared conflicts or that the parties discussed fee arrangements and scheduling. As *Daddono* makes clear, discussion of a retainer and hourly rate and even forwarding a "fee schedule and typical contract" do not establish an objectively

reasonable belief that confidential information would be, or was, exchanged. *Id.* at *3–4. Nor does Grill Rescue cite any authority holding that a conflicts check alone establishes a confidential relationship. Indeed, courts in this Circuit have required more. *See, e.g.*, *De Palo*, 2013 WL 12304736, at *2 ("Until a conflict check had been run, ***<u>and the parties had agreed that Mr. Goldfarb would serve as Defendant's expert</u>***, it was not reasonable for Ms. Macaluso to assume that a confidential relationship existed between her and Mr. Goldfarb.") (emphasis added).

Here, Grill Rescue's attorneys repeatedly acknowledge, even into mid-September 2026, that Mr. Plumpe was not yet retained and that it was not certain whether he would ever actually be engaged, as reflected by their own correspondence with him and confirmed in correspondence with Frost Buddy's counsel. *See* Wolek Decl. at Ex. B ("I understand you had discussions with our office about ***<u>potentially</u>*** assisting as an expert witness") (emphasis added); *see also id.* at Ex. D (Plaintiff's counsel alleging on October 16, 2026 that "Plaintiff consulted Mr. Plumpe as a ***<u>prospective</u>*** damages expert") (emphasis added). In this case, Grill Rescue's counsel, as sophisticated attorneys, knew or should have known that there was no confidential relationship with Mr. Plumpe where Mr. Plumpe had not actually been retained by Grill Rescue or its counsel.

#### ***2. Mr. Plumpe's Evidence Demonstrates That No Confidential Relationship Existed.***

Mr. Plumpe has submitted in evidence to the Court a fulsome, sworn declaration vigorously denying that he had a confidential relationship with Grill Rescue's counsel as a result of these preliminary conversations and further denying that he received any confidential or privileged information in the context of these short, preliminary, pre-engagement calls.

To start, Mr. Plumpe himself did not believe that a confidential relationship existed between him and Grill Rescue's counsel. *See* Plumpe Decl. ¶¶ 9–18. Mr. Plumpe described the initial thirty-minute phone call with Grill Rescue's counsel on August 27, 2026 as nothing more

than a preliminary discussion – and, more significantly, about a ***different*** case pending in Illinois, not this case. *Id.* at ¶ 10. The only discussion about this case (on August 28, 2026) is described in writing by Mr. Plumpe as a "brief introductory conversation," which similarly lasted no more than thirty minutes and which did not involve the transmission of any privileged or confidential information. *Id.* at ¶¶ 11–12. Mr. Plumpe did not believe that these limited discussions with Grill Rescue's counsel amounted to anything more than a "basic introductory call," similar to countless preliminary calls he has conducted with attorneys prior to potential engagements. *Id.* at ¶¶ 9–14. No information was exchanged during those discussions beyond what Mr. Plumpe would normally receive from counsel in an introductory call prior to potentially being retained. *Id.* at ¶ 14. Neither call involved the discussion of confidential or privileged information about Grill Rescue's strategy in either the separate Illinois case or this case, the strengths and weaknesses of the claims and damages against the defendants in either case, Grill Rescue's strategy for its expert reports in either case, Grill Rescue's procedural plans for either case, or any "candid" assessment of the facts and of Grill Rescue's litigation positions in either case. *Id.* at ¶¶ 10, 12. Instead, the preliminary calls only involved general discussions of the allegations in Plaintiff's pleading, the available categories of damages under the applicable statutes, the court's schedule for expert disclosures, and Mr. Plumpe's experience in similar types of cases. *Id.*

At no point did either Mr. Plumpe or Grill Rescue's counsel signal that either party believed a confidential relationship existed, Grill Rescue's counsel never asked Mr. Plumpe to keep their conversations confidential, and Mr. Plumpe never suggested that he would keep their conversations confidential (in addition to the fact that no confidential information was actually exchanged). *Id.* at ¶¶ 14–15. In initial discussions with counsel in other cases, Mr. Plumpe has at times been asked to sign confidentiality or non-disclosure agreements prior to receiving

information, and Mr. Plumpe himself has told counsel proposing to share confidential information not to share it with him prior to his formal engagement; none of this happened here, as there was no indication from either party that confidential information was being discussed. *Id.* at ¶¶ 14–16. Moreover, the general practice of Mr. Plumpe and Epsilon Economics is to not accept confidential information prior to being engaged. *Id.* at ¶ 17. Ultimately, Mr. Plumpe did not conduct any analysis, formulate any opinions, log any time, request payment, or send a proposed budget or engagement letter. *Id.* at ¶ 15. When counsel for Frost Buddy discussed Mr. Plumpe serving as an expert witness for Frost Buddy, Mr. Plumpe confirmed that he did not believe any confidential relationship existed between him and Plaintiff.[4] *Id.* at ¶ 23; Hickey Decl. ¶ 5.

Based on the foregoing, it is clear that no confidential relationship existed between Plaintiff and Mr. Plumpe. Even if Grill Rescue's counsel truly did believe that such a relationship existed, such belief would not be "objectively reasonable" on this record. Courts in this Circuit have denied motions to disqualify based on far more substantial relationships. In *Thaller*, 2016 WL 6441548, the Southern District of Florida declined to disqualify an expert even though (1) the party seeking disqualification (plaintiff) had previously disclosed him as a potential expert witness on its initial disclosures, and (2) the expert had a formal, written confidentiality agreement with the predecessor in interest of the party seeking disqualification. *Id.* at *15–16. Similarly, courts in this Circuit have held: "[t]he fact that [movant's counsel] had a written retention agreement with [expert], which contained a confidentiality provision, alone, does not satisfy the first factor. Depending on the type of relationship that existed, disqualification 'may not be warranted even if the expert

[4] Mr. Plumpe's contacts with counsel for Grill Rescue were so cursory and insubstantial that counsel for Grill Rescue admitted on the record during Mr. Plumpe's deposition that the Fox Rothschild firm did not even know how to pronounce Mr. Plumpe's name. *See* Hickey Decl., Ex. 3, Plumpe Dep., at 5:13–17.

witness has signed a confidentiality agreement with the adversary.'" *Culliver*, 2022 WL 19568967, at *3. Thus, the bar for establishing a confidential relationship between a moving party and expert—or an objectively reasonable belief in the same—is quite high.

Grill Rescue repeatedly cites *Goldman v. Bracewell & Patterson, L.L.P.*, No. 6:04-CV-725-ORL18JGG, 2005 WL 5960357 (M.D. Fla. May 9, 2005) and *Cannon v. DePuy Orthopaedics, Inc.*, No. 1:22-cv-5152-MLB, 2023 WL 7477903 (N.D. Ga. Aug. 16, 2023) for the proposition that a confidential relationship could theoretically exist without a formal agreement. However, each of these cases heavily weighs against disqualification here. The *Goldman* court ruled against disqualification of an expert, holding the following:

> [T]he Court finds that [Plaintiff] has not met his burden as to any of the three factors described in the *Wayne* case. From this record, it does not appear that [Plaintiff's counsel] and [expert] entered into a confidential relationship or that [Plaintiff's counsel] could have reasonably concluded that they did. More than the members of any other profession, attorneys are aware of the need to avoid blurting out confidential information to an individual who may already work for the other party in the law suit-or, more likely, whose law firm may already do so. It is extremely unlikely that two highly experienced attorneys simultaneously forgot this principle.

*Goldman*, 2005 WL 5960357, at *2. The *Cannon* court ultimately found that the moving party met its burden to disqualify an expert, but in view of far different facts compared to the instant case. In *Cannon*, the expert (1) expressly told the moving party he would turn down the opposing party and intended to work with the moving party; (2) met with the moving party on four occasions; (3) received confidential information, which the moving party's counsel told the expert not to share, and which the expert expressly agreed not to share; and (4) was paid $28,500 for his work consulting on the case. *See Cannon*, 2023 WL 7477903, at *3. Thus, neither *Goldman* nor

*Cannon*, nor any other case cited by Grill Rescue, supports disqualification in the instant case.[5] Grill Rescue's remaining authorities are likewise distinguishable.

Here, Grill Rescue cannot meet its burden of demonstrating that it was objectively reasonable to believe a confidential relationship existed, where Mr. Plumpe was never formally engaged, never paid, never provided with any case materials aside from the public pleading, and the extent of the relationship consisted of one short phone call (regarding a separate case) and a short virtual meeting the following day. This is particularly true given that "[a]ny ambiguities regarding whether there was a confidential relationship between an attorney and an expert should be resolved against the attorney claiming such a relationship existed." *Daddono*, 2022 WL 2802695, at *3.

**C. Grill Rescue Has Not Shown, With the Required Specificity, That Confidential Information Was Actually Disclosed to Mr. Plumpe.**

Even if Grill Rescue could establish an objectively reasonable belief in a confidential relationship (which it cannot), the Motion independently fails because Grill Rescue has not carried its burden of establishing that confidential or privileged information was, in fact, disclosed. Grill

[5] For example, Grill Rescue also repeatedly cites *Domercant v. State Farm Fire & Casualty Co.*, Civil Action No. 1:11-cv-02655-JOF, 2013 WL 11904719 (N.D. Ga. May 15, 2013) and *Koch Ref. Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1183 (5th Cir. 1996), but they are both easily distinguished along with Plaintiff's other extra-jurisdictional cases. *Domercant* is an actual side-switching case where the excluded expert had worked as outside counsel for the other side (State Farm) for over 25 years, had been exposed to confidential and privileged information over the scope of that long-standing relationship, and was one of many potential experts relating to the settling of automobile liability claims. *See* 2013 WL 11904719, at *3–4. In *Koch*, the Fifth Circuit found that the district court did not clearly err in finding a reasonable expectation of a confidential relationship where the expert relationship was more aptly described as a "long-standing series of interactions" than an initial consultation, where the expert was paid $8000 for his work, and where the expert provided several written reports. *See* 85 F.3d at 1182. Counsel also "spent considerable time with [the expert] explaining his entire theory of the case as well as trial tactics for the 1990 trial" and where counsel "furnished [the expert] with documents that had been generated in preparation for the trial of this matter and participated in the formulation of graphics by [the expert]." *Id.* The Fifth Circuit found that the district court did not abuse its discretion in disqualifying the expert "under this very limited and specific factual scenario." *Id.* at 1183.

Rescue's Motion relies on generalized, conclusory assertions, advanced through counsel's own self-serving allegation that counsel discussed "strategy," "categories of damages and remedies," "strengths and weaknesses," "procedural plans," and "Counsel's candid assessment of the facts" during the two discussions in August 2026, only one of which related to this case. Courts in this Circuit have squarely rejected this kind of generic recitation as insufficient to meet a movant's evidentiary burden. *See, e.g.*, *Daddono*, 2022 WL 2802695, at *4 ("The recitation in lead counsel's declaration of generalized language, in an apparent attempt to meet the threshold espoused in case law, is not sufficient to carry Plaintiff's burden of proof"); *Culliver*, 2022 WL 19568967, at *4–5 ("A blanket statement that confidential and privileged information was provided does not meet [defendant]'s burden of proof on confidentiality").

In *Daddono*, the court held that plaintiff's counsel's averment in an affidavit, in conclusory fashion, that he shared legal theories, defenses, and the strengths and weaknesses of the case with the prospective expert was not sufficient to carry the movant's burden of proof, particularly where the party resisting disqualification denied having received or recalling any such information and the movant offered no evidence or submissions. *See Daddono*, 2022 WL 2802695, at *4. The court cited *In re Androgel Antitrust Litigation (No. II)*, No. 1:09-MD-2084-TWT, 2011 WL 1882516, at *4 (N.D. Ga. May 17, 2011), for the proposition that general and vague allegations, such as an attorney's views on the strengths and weaknesses of a case, are not sufficiently specific to establish disclosure of confidential information. *Daddono*, 2022 WL 2802695, at *4. The same deficiency exists, and is fatal, here. Grill Rescue's Motion does not identify a single specific fact, document, theory, or strategic detail that was purportedly conveyed to Mr. Plumpe. Instead, Grill Rescue's counsel offers only the same category of generalized labels, "strategy," "assessments," and "damages theories," that *Daddono* and other federal opinions have already held insufficient.

Significantly, Mr. Plumpe strongly disagrees with Grill Rescue's characterization of the types of information shared during the limited August 2026 discussions. The information shared with Mr. Plumpe was consistent with the information generally shared with him on introductory calls with counsel, prior to accepting an engagement. *See* Plumpe Decl. ¶¶ 6, 14, 16, 17. Contrary to the current self-serving portrayals by Grill Rescue's counsel, Mr. Plumpe himself did not believe that the information being shared by Grill Rescue's counsel was confidential. *Id.* at ¶¶ 9–18. Indeed, Mr. Plumpe confirmed there was no discussion of the strengths and weaknesses of the claims and damages in the case, no discussion of Grill Rescue's strategy for its expert reports, no discussion of Grill Rescue's procedural plans, and no candid assessment of the facts or of Grill Rescue's litigation positions. *Id.* at ¶¶ 10, 12. Furthermore, Mr. Plumpe has confirmed that no information obtained from Grill Rescue's counsel was used to formulate his opinions for Frost Buddy in this case. *See id.* at ¶ 31; Hickey Decl. ¶ 7.

Moreover, Grill Rescue's showing is particularly inadequate given Grill Rescue appears to assert that it considered retaining Mr. Plumpe as a testifying damages expert, as opposed to merely a consulting expert. Federal Rule of Civil Procedure 26(a)(2)(B) requires a testifying expert to disclose the facts and data considered in forming his opinions, and Rule 26(b)(4)(C) does not protect communications between a party's attorney and a testifying expert to the extent those communications relate to compensation, identify facts or data that the attorney provided and that the expert considered, or identify assumptions that the attorney provided and that the expert relied upon in forming the opinions to be expressed. Where, as here, a party approaches an individual for the specific purpose of retaining him as a testifying damages expert and discusses the damages theories it intends him to evaluate, it is objectively ***un***reasonable for that party to expect those communications to remain confidential or privileged, given that Rule 26 itself contemplates their

eventual disclosure if the expert is retained and designated.[6] Courts in this Circuit have recognized as much. *See Culliver*, 2022 WL 19568967, at *4 (holding because the expert could be asked to testify, his "work would have been discoverable under Federal Rule of Civil Procedure 26.").

**D. Policy and Fairness Considerations Weigh Decisively Against Disqualification.**

Even where a movant makes some showing on the threshold factors, courts additionally weigh policy and fairness considerations, including the availability of a comparably qualified alternative expert, and the disruption that disqualification would cause at the stage of litigation in which the motion is filed. *Glasser*, 2017 WL 3584930, at *2; *Thaller*, 2016 WL 6441548, at *15. Each of these considerations favors Frost Buddy.

***1. Availability of Comparable Experts***

Mr. Plumpe is a Managing Director at Epsilon Economics with substantial, specialized experience calculating damages in intellectual property disputes involving patents and trade secrets — the exact types of damages at issue in this case. *See* Plumpe Decl. ¶¶ 1, 3–5. Additionally, Mr. Plumpe has both a B.S. and an M.S. in mechanical engineering, which he has relied upon in part to support his opinions relating to a "head start" theory for unjust enrichment damages. *See* Hickey Decl., Ex. 3, Plumpe Dep., at pp. 93–94. The combination of an MBA from the University of Chicago, multiple mechanical engineering degrees, and more than 25 years of experience in damages calculations in intellectual property disputes is truly a unique and specialized expert perspective. *See* Plumpe Decl. ¶¶ 1, 3–5.

---

[6] Mr. Plumpe himself "cannot recall a time when I was not permitted to answer these questions [about information communicated in such preliminary calls] on grounds that the client or law firm with whom I had these pre-engagement preliminary meetings contended that the conversations were somehow protected confidential or privileged communications." Plumpe Decl. ¶ 17. Indeed, on November 13, 2026, during Grill Rescue's deposition of Mr. Plumpe, Grill Rescue's counsel asked multiple questions about the substance of Mr. Plumpe's preliminary, pre-engagement communications with counsel for Frost Buddy, without objection. *See* Hickey Decl., Ex. 3, Plumpe Dep., at 116:7–117:23; 118:17–120:13; 123:15–124:17.

Federal courts are "particularly careful about disqualifying those experts who possess useful, specialized knowledge and are few in number." *Daddono*, 2022 WL 2802695, at *3; *see also id.* at *5 (denying disqualification where the challenged expert possessed scarce, specialized knowledge); *Koch*, 85 F.3d at 1183. In this case, identifying a qualified substitute with Mr. Plumpe's unique attributes may be difficult, if not impossible, especially at this late stage of the case. Frankly, it is not surprising that both Grill Rescue and Frost Buddy would have independently identified Mr. Plumpe as a potential expert, given his unique, specialized experience with this subject matter, and thus preliminary meetings with an opposing party do not, and should not, suffice to disqualify him from this matter. *See, e.g.*, *Koch*, 85 F.3d at 1183 (cautioning against allowing parties to manufacture an inexpensive relationship with potentially harmful experts solely to keep them from the opposing side). There is no indication, nor does Grill Rescue allege, that Frost Buddy or its counsel somehow engineered Mr. Plumpe's retention as a tactical maneuver to deprive Grill Rescue of a particular expert or take advantage of any information he obtained from Grill Rescue.[7] Rather, Mr. Plumpe was recommended to Frost Buddy because Frost Buddy's local counsel utilized Mr. Plumpe in a recent case. Plumpe Decl. ¶ 19; Hickey Decl. ¶ 3.

[7] If anything, the timing of Grill Rescue's later contacts with Mr. Plumpe is peculiar. Grill Rescue requested a budget for this case from Mr. Plumpe on September 10 and again on September 14, 2026, just days before Plaintiff's expert disclosure deadline of September 17, 2026. *See* Plumpe Decl. ¶¶ 26, 29. However, Grill Rescue timely submitted an expert report on alleged damages in this case on September 17, 2026, from Stephen Holzen, who likely required more than a few days to prepare his forty-four page work product. Mr. Holzen testified that he had been contacted by Fox Rothschild in connection with this case within the six months before the report was due and "maybe within three months before the report was filed" and that he had "sufficient time to complete" his report. *See* Hickey Decl., Ex. 4, Holzen Depo., p. 16, lines 3–7, 19–21. If Mr. Holzen had already been engaged, which is most likely the case, then contacting Mr. Plumpe on September 10 and 14 to provide a budget makes no sense and raises concerns that an attempt was being made to "manufacture an 'inexpensive relationship with potentially harmful experts solely to keep them' from being used against them by the opposing side." *Daddono*, 2022 WL 2802695, at *3 (quoting *Koch*, 85 F.3d at 1183).

Ultimately, it is within Mr. Plumpe's province to decide with which party he wishes to associate and provide services. Even after Mr. Plumpe had determined that he was no longer comfortable with the prospect of serving as an expert for Grill Rescue (recognizing the Court's September 17th expert report disclosure date and his impending travel to a remote part of the United States from September 10 through 14), Mr. Plumpe nonetheless advised Grill Rescue on September 11 that Epsilon would need to re-run its conflicts check, because he had not yet received a fully executed engagement letter and retainer payment from Frost Buddy. *See* Plumpe Decl. ¶¶ 24, 27. It was Mr. Plumpe's choice as to whom to engage and when and on what terms, and Grill Rescue's limited, preliminary, pre-engagement discussions should not bar him from providing his highly specialized services to an adverse party like Frost Buddy.

### *2. Disruption to the Litigation*

Disqualifying Mr. Plumpe at this stage — after Frost Buddy has served its Rule 26 expert disclosures, relied on Mr. Plumpe's rebuttal report in preparing its defense, and ***prepared for and defended Grill Rescue's deposition of Mr. Plumpe*** — would cause precisely the kind of late-stage disruption and prejudice that courts have found strongly weighs against disqualification. *Thaller*, 2016 WL 6441548, at *15–16; *Glasser*, 2017 WL 3584930, at *2–4. Frost Buddy would be forced to try to locate, retain, and prepare a similarly specialized replacement damages expert on an unduly compressed timeline, through no fault of its own, based on an alleged conflict that Grill Rescue delayed in raising — all of this, after Frost Buddy has incurred in excess of $125,000 in fees to Epsilon for Mr. Plumpe's work. *See* Plumpe Decl. ¶ 30.

Indeed, on October 30, 2026, well before filing the instant Motion, Grill Rescue filed a notice of deposition seeking to depose Mr. Plumpe on November 13, 2026. *See* Hickey Decl. ¶ 8. On or about November 9, 2026, counsel for Frost Buddy confirmed that Mr. Plumpe was available for the November 13, 2026 deposition. *See id.* at ¶ 9. The following day (but more than three

weeks after Mr. Plumpe's expert report was submitted), Grill Rescue filed this Motion to Strike and then nonetheless moved forward with deposing Mr. Plumpe on November 13, 2026, *see id.* at ¶ 10. Grill Rescue's delay required Frost Buddy to incur substantial expense in preparing for and defending Mr. Plumpe's deposition. And notably, Grill Rescue omitted from its moving papers the fact of this upcoming (and now completed) deposition of Mr. Plumpe. During the deposition, Grill Rescue's counsel asked extensive questions about the pre-engagement interactions of Mr. Plumpe with Lewis Rice and Frost Buddy, thereby mooting its request for expedited discovery relief. *See* Hickey Decl., Ex. 3, Plumpe Dep., at pp. 13–15; 21–34. Grill Rescue's assertion that it acted promptly, cannot be squared with this sequence.

Grill Rescue's course of conduct is illustrative of the exact type of disruption, inefficiency, and prejudice that the case law warns against. Courts have declined to disqualify experts under far more compelling circumstances, and this Court should similarly decline disqualification here.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Grill Rescue has not met, and cannot meet, its burden of establishing that it had a confidential relationship with Mr. Plumpe, that it was objectively reasonable to believe a confidential relationship existed with Mr. Plumpe, or that confidential or privileged information was in fact disclosed to him. The Court should deny Grill Rescue's Motion in its entirety, including its alternative request for expedited discovery.

Dated: November 16, 2026

Respectfully submitted,

By: ***s/ Aleksey Shtivelman***

Aleksey Shtivelman
Florida Bar No. 99159
ashtivelman@shutts.com
SHUTTS & BOWEN LLP
200 S. Biscayne Boulevard,
Suite 4100
Miami, Florida 33133
Tel.: (305) 379-9135

and

Michael J. Hickey, #47136(MO)
*Admitted Pro Hac Vice*
Bridget Hoy, #50733(MO)
*Admitted Pro Hac Vice*
LEWIS RICE LLC
600 Washington Avenue,
Suite 2500
St. Louis, MO 63101
Tel.: (314) 444-7600
mhickey@lewisrice.com
bhoy@lewisrice.com

*Attorneys for Defendant*
*Frost Buddy LLC*