**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:26-cv-80481-DMM**

GRILL RESCUE LLC d/b/a RESCUE LLC,

Plaintiff,

v.

SHENZHEN REEKOOS HOUSEWARE
CO. LTD, et al.,

Defendants.
_____________________________________/

**DECLARATION OF MICHAEL J. HICKEY**

I, Michael J. Hickey, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney at law, licensed in Missouri and Illinois, and admitted *pro hac vice* to the Southern District of Florida for the above-captioned case. I am a Member of the law firm Lewis Rice LLC, which serves as attorneys for Defendant Frost Buddy LLC ("Frost Buddy").

2. I submit this Declaration in support of Frost Buddy's Opposition to Plaintiff Grill Rescue LLC's Motion to Strike John Plumpe and for Related Expedited Discovery. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently to them.

3. I confirm Mr. Plumpe's statements in paragraph 19 of his Declaration. Specifically, I called him on or about September 2 or 3, 2026 regarding a potential expert engagement in this case. I told Mr. Plumpe that he had been recommended to us by our local counsel, Shutts & Bowen, with whom Mr. Plumpe had recently completed a trial. I asked Mr. Plumpe to clear conflicts with respect to this case. Mr. Plumpe told me he would get back to me.

4. I confirm Mr. Plumpe's statements in paragraph 22 of his Declaration. Specifically, I called Mr. Plumpe again on September 3 or 4, 2026, and inquired about the status of the conflicts check. Mr. Plumpe asked me if I had talked to Shutts & Bowen, or specifically Mr. Woodrow Pollack at Shutts & Bowen. I indicated I had not. Mr. Plumpe told me to talk to Mr. Pollack or Shutts & Bowen. The call then ended.

5. I confirm Mr. Plumpe's statements in paragraph 23 of his Declaration. On or about September 4, 2026, I called Mr. Plumpe a third time. I told Mr. Plumpe that Frost Buddy and the law firms representing it in this case (Lewis Rice and Shutts & Bowen) had no issue engaging Epsilon Economics ("Epsilon") so long as Mr. Plumpe did not have a confidential relationship with Fox Rothschild or Grill Rescue and that Mr. Plumpe had not received any confidential or privileged information from Fox Rothschild. Mr. Plumpe did not reveal any substantive content of his communications with Fox Rothschild except to confirm that he did not have such a confidential relationship with Fox Rothschild and that he did not receive any such confidential or privileged information from Fox Rothschild. Mr. Plumpe and I did not have any substantive discussions about this case at that time. I thereafter sent an email to Mr. Plumpe with my contact information for purposes of obtaining a draft engagement letter from Epsilon. A true and accurate copy of that email is attached as **<u>Exhibit 4</u>** to Mr. Plumpe's Declaration.

6. I confirm Mr. Plumpe's statements in paragraph 25 of his Declaration. I received a signed engagement letter from Epsilon on September 9, 2026, setting forth the proposed terms of the engagement with Epsilon and Mr. Plumpe, including confidentiality provisions. A true and accurate copy of that email is attached as **<u>Exhibit 5</u>** to Mr. Plumpe's Declaration. I signed that engagement letter on behalf of Lewis Rice on September 10, 2026, and Mitch Mammoser signed it on behalf of Frost Buddy on September 11, 2026. I then sent the signed engagement letter to

Mr. Plumpe on September 11, 2026, and indicated that a retainer payment would be made to secure the engagement. A true and accurate copy of that email conveying the fully executed engagement letter with Epsilon is attached as **Exhibit 6** to Mr. Plumpe's Declaration. A true and accurate copy of the fully executed engagement letter with Epsilon (which has been previously produced to Grill Rescue as FBGR_00044686 – FBGR_00044689) is attached hereto as **Exhibit 1** to my Declaration.

7. I confirm Mr. Plumpe's statements in the last sentence of paragraph 31 of his Declaration that Mr. Plumpe did not tell me or any other counsel for Frost Buddy anything about his preliminary, pre-engagement conversations with Grill Rescue other than what is set forth in his Declaration and he did not share the notes of his August 28, 2026 call with Mr. Frederick and Mr. Wolek. Mr. Plumpe did not speak with anyone else on behalf of Frost Buddy (other than Mr. Pollack of Shutts & Bowen as described in paragraph 21 of Mr. Plumpe's Declaration) until after the engagement was formalized on September 11, 2026.

8. On October 30, 2026, Grill Rescue served a notice of deposition with respect to Mr. Plumpe, scheduling the deposition to occur on November 13, 2026. A true and accurate copy of that notice is attached hereto as **Exhibit 2**.

9. On November 9, 2026, my partner Bridget Hoy confirmed with counsel for Grill Rescue that Mr. Plumpe's jury duty for the week of November 9th was complete and that he remained available for deposition on November 13, 2026.

10. On November 13, 2026, Mr. Plumpe was deposed for approximately eight hours and thirty-nine minutes.

11. Attached to my Declaration as **Exhibit 3** is a true and accurate copy of excerpts of the deposition transcript of John Plumpe, dated November 13, 2026.

12. Attached to my Declaration as **Exhibit 4** is a true and accurate copy of excerpts of the deposition transcript of Stephen Holzen, dated October 13, 2026.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 16th day of November, 2026.

Michael J. Hickey

# EXHIBIT 1

epsilon
economics

September 9, 2026

VIA ELECTRONIC MAIL

Michael Hickey, Esq.
Lewis Rice LLC
600 Washington Avenue, Suite 2500
St. Louis, MO 63101

Re: Grill Rescue LLC d/b/a Rescue LLC v. Shenzhen Reekoos Houseware Co. Ltd., *et al.*

Dear Mr. Hickey:

This letter confirms Lewis Rice LLC ("Counsel") has been authorized on behalf of Frost Buddy LLC ("Client") to engage EPSILON ECONOMICS LLC ("EPSILON") to provide consulting services in the above-captioned matter.

John Plumpe ("Expert") will lead this engagement and provide economic consulting services to Counsel at Counsel's request and direction. The services to be rendered on this engagement may include providing expert testimony. Expert understands that Counsel is interested in obtaining Expert's objective and independent analysis in connection with this matter.

Client shall compensate EPSILON for services provided, which shall include EPSILON's fees and reimbursable costs and expenses. Expert's hourly fee is $845. EPSILON's current hourly staff rates are $445 - $750. Hourly rates typically change on January 1. EPSILON requires a retainer of $25,000 prior to beginning work. The retainer will apply against the final invoice balance. If this matter proceeds to the trial phase, EPSILON requires the payment of a second retainer, in addition to any retainers previously paid to and held by EPSILON, prior to beginning any trial preparation work or traveling to and attending the trial. Once a trial date has been set by the Court, and Client or Counsel indicate that EPSILON's or Expert's assistance in trial preparation and/or trial testimony may be requested, EPSILON will issue an invoice for a retainer of $30,000 which will be credited towards EPSILON's first invoice following the conclusion of trial. This retainer payment will be due no later than thirty (30) days prior to the beginning of the trial. Any unused retainer funds will be returned.

EPSILON's standard commercial terms, which Counsel and Client accept, are attached.

The work undertaken by Expert and EPSILON in connection with this matter is being done for and under the direction of Counsel and, accordingly, is part of Counsel's work-product. EPSILON will not disclose any confidential or privileged information to any third party; provided, however, that EPSILON may disclose confidential or privileged information (a) to EPSILON's employees, affiliates, vendors or agents who provide services in connection with this engagement, (b) with Counsel's written consent, or (c) when legally required to do so. Both parties agree that confidential and proprietary information will not be construed to include information that is available from public sources or sources not subject to obligations of confidentiality to Counsel.

Sincerely,

[signature]

Ashley Walsh

President & Chief Operating Officer

On behalf of EPSILON ECONOMICS LLC

AGREED AND ACCEPTED:

Lewis Rice LLC

By [signature]

Date September 10, 2026

Michael Hickey, Esq.

| Frost Buddy LLC | | Frost Buddy LLC Billing Contact | |
|---|---|---|---|
| By | [signature] | Name | Mitch Mammoser |
| Name | Mitch Mammoser | Phone | 618-553-8216 |
| Title | Owner | Email | accounting@frostbuddy.com |
| Date | 09/11/2026 | | |

epsilon
economics

**EPSILON Standard Commercial Terms**

EPSILON will bill for services on a monthly basis and will provide sufficient detail identifying services rendered and expenses incurred. EPSILON includes an administrative, research, data and technology charge of 5% of fees on all invoices to cover administrative support (which is not billed on an hourly basis), software, and research databases. EPSILON's invoices shall be paid within thirty (30) days of the statement date. A late payment charge of one percent (1) per month (or the maximum rate permitted by law, whichever is less) may be added to any amounts more than thirty (30) days past due. If Client fails to object to any invoice within thirty (30) days of receipt of such invoice, then Client will be deemed to have agreed to such invoice and waived any objection thereto. Client agrees not to charge EPSILON any fees for use of Client's e-billing system. All past due invoices must be cleared before EPSILON provides work product (e.g., reports, testimony) to the Client or Counsel.

This agreement may be terminated upon written notice by EPSILON, Counsel or Client; however, termination shall not relieve Client of its obligation to pay all amounts due to EPSILON for services provided through the date of termination.

Any estimate of anticipated fees for services that may be provided to Counsel or Client prior to or during the course of the work is Expert's and EPSILON's best estimate of the effort that will be required to complete the services based on the information available to Expert and EPSILON at the time. Such an estimate shall not be deemed a maximum fee or a fixed price.

Any controversy, dispute, or claim between Client or Counsel on the one hand and EPSILON on the other hand of whatever nature arising out of, in connection with, or in relation to the interpretation, performance or breach of this agreement, including any claim based on contract, tort, or statute, shall be resolved at the request of any party to this agreement, by final and binding arbitration, administered by and in accordance with the then existing Rules of Practice and Procedure of Judicial Arbitration & Mediation Services, Inc. (JAMS), or its successor entity, and judgment upon any award rendered by the arbitrator may be entered by any State or Federal Court having jurisdiction thereof. Any such arbitration shall take place exclusively in Chicago, IL. The prevailing party shall be entitled to reasonable attorneys' fees and costs incurred in enforcing this agreement through arbitration or otherwise and reasonable attorneys' fees and costs incurred in appealing or enforcing any judgment entered by the arbitrator in any court having jurisdiction. The parties shall not be liable to each other for any consequential, incidental, special or punitive damages, nor shall

EPSILON be liable for direct compensatory damages in excess of the fees actually received by EPSILON for the performance of services hereunder.

This agreement contains the full terms of the engagement with respect to the matter described herein, and any additional or modified terms relating to such engagement must be agreed to by all parties in writing.

# EXHIBIT 2

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA WEST PALM BEACH DIVISION**

| | | |
|---|---|---|
| GRILL RESCUE LLC d/b/a RESCUE LLC,<br><br>Plaintiff,<br><br>v.<br><br>SHENZHEN REEKOOS HOUSEWARE CO. LTD; WEILIANG GU; and FROST BUDDY LLC<br><br>Defendants. | ) | Case No. 9:26-cv-80481-DMM |

**PLAINTIFF'S NOTICE OF DEPOSITION OF JOHN G. PLUMPE**

PLEASE TAKE NOTICE THAT, pursuant to Rules 26(b)(4)(A) and 30(b)(1) of the Federal Rules of Civil Procedure, counsel for Plaintiff Grill Rescue LLC d/b/a Rescue LLC ("Plaintiff" or "Grill Rescue"), will take the deposition upon oral examination, as recorded by audiovisual and stenographic means, of expert witness John G. Plumpe **10:00 am EST on November 13, 2026**, and will be conducted via remote video conferencing, and will continue from day to day until completed, or at such other date, time, and location as may be mutually agreed upon by the parties. The deposition will be taken before a notary public or other officer authorized by law to administer oaths. The deposition will be recorded by stenographic and/or videographic means.

Plaintiff serves this notice solely because of the deadlines and limitations imposed by the Court's Scheduling Order. By noticing and taking this deposition, Plaintiff does not waive, and expressly reserves, all rights, objections, and arguments. Nothing herein shall be construed as a concession that the report or opinions are timely, proper, or admissible.

The deposition will be taken before a notary public or other officer authorized by law to administer oaths. The deposition will be recorded by stenographic and/or videographic means

Dated: October 30, 2026

FOX ROTHSCHILD LLP

*/s/ Adam Wolek*

Adam Wolek (Fla. Bar No. 1033265)
Fox Rothschild LLP
777 South Flagler Drive
Suite 1700, West Tower
West Palm Beach, FL 33401
Phone: (561) 835-9600
Fax: (561) 835-9602
awolek@foxrothschild.com

Clarissa Sullivan (Fla. Bar No. 1048526)
Fox Rothschild LLP
101 S. Tryon St. Suite 1700
Charlotte, NC 28280
Phone: (704) 384-2640
Fax: (704) 384-2800
csullivan@foxrothschild.com

*Attorneys for Plaintiff*
*Grill Rescue LLC d/b/a Rescue LLC*

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | | |
|---|---|---|
| GRILL RESCUE LLC d/b/a RESCUE LLC,<br><br>Plaintiff,<br><br>v.<br><br>SHENZHEN REEKOOS HOUSEWARE CO. LTD; WEILIANG GU; and FROST BUDDY LLC<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 9:26-cv-80481-DMM |

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2026, I caused the foregoing document to be served by electronic mail on all counsel of record for Defendant, as well as service email addresses, as identified in the Service List below.

Aleksey Shtivelman
SHUTTS & BOWEN LLP
ashtivelman@shutts.com

Michael J. Hickey
Bridget Hoy
LEWIS RICE LLC
mhickey@lewisrice.com
bhoy@lewisrice.com

Jose Rojas
ROJAS LAW
jrojas@rojaslawfirm.com

By: *_________/s/ Adam Wolek_________*
Adam Wolek (Fla. Bar No. 1033265)

# EXHIBIT 3

* * [redacted]-ROUGH DRAFT * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:26-cv-80481-DMM

GRILL RESCUE LLC d/b/a RESCUE LLC,

Plaintiff,

v.

SHENZHEN REEKOOS HOUSEWARE CO. LTD;
WEILIANG GU; and FROST BUDDY LLC,

Defendants.
_______________________________________/

* * * * *CONFIDENTIAL - ATTORNEYS' EYES ONLY* * * * *

REMOTE VIDEORECORDED DEPOSITION OF

JOHN G. PLUMPE

(VIA ZOOM)

Friday, November 13, 2026

10:01 a.m. - 6:40 p.m.

Reported remotely by:
Kristen Camfield, RPR, FPR
Notary Public, State of Florida
Esquire Deposition Services
Job #J15743326

MR. ROJAS: This is Jose Rojas of Rojas Law on behalf of defendants Shenzhen Reekoos and Weiliang Gu.

THE COURT REPORTER: Mr. Plumpe, would you raise your right hand, please.

Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

DIRECT (JOHN G. PLUMPE)

BY MR. TOFT:

Q Sorry. Mr. Plumpe, you said that's how you pronounce it, correct, Mr. Plumpe?

A Correct.

Q Okay. That was fiercely debated in our office prior to today.

You've been deposed before several times, correct?

A Yes.

Q How many times?

A Going from memory, it's probably in the neighborhood of 55 to 60 perhaps.

Q Okay. So you're pretty familiar with the rules?

by Lewis Rice on behalf of Frost Buddy, if I recall.
Q Okay. And when were you retained by Lewis Rice?
A I believe it was September -- I think it may have been over a weekend when it came through to me, maybe September 12th, September 11th, somewhere around there.
Q It looks like September 11th was a Friday. Does that refresh your recollection as to --
A Not entirely. Not entirely.
Q When you say it got to you, what do you mean by that?
A I was away from my phone for a period around -- on the days around that weekend. So you know, I kind of was -- kind of like today people are doing with Outlook, I was sort of catching up on emails in batches and waves.
Q So when you say it got to you, the request to -- that -- it wasn't a retention at this time; it was a reach-out?
A No.
Q So you signed the engagement letter that weekend?
A I did not sign an engagement letter.
Q Who signed the engagement letter?

A I believe it was Epsilon Economics Officer Ashley Walsh, and if I recall correctly, Mr. Hickey from the Lewis Rice law firm.

Q Ashley Walsh signed an engagement letter with Lewis Rice?

A Yes. And there may have been a signature from Frost Buddy on there. I don't -- I don't recall.

Q Okay. And when was that executed?

A Well, that's what I was thinking about when I answered your earlier question. I think it came to me around the 11th or 12th I saw it of September. So it was probably around say September 11th, roughly.

THE WITNESS: My Teams just popped up, Mr. Toft. I thought I had it shut down, and I was on "Do Not Disturb". Can we go off the record just for a moment so I can shut that down?

MR. TOFT: Sure.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Off the record at 10:15.

(Discussion held off the record.)

THE VIDEOGRAPHER: And we're back on the record at 10:16.

BY MR. TOFT:

Q So when you received the engagement letter around September 11th or 12th, what did you do?

A I was on PTO and kind of away from work for that weekend and the Monday after, so I didn't really do anything. So, yeah, I didn't really do anything in the -- in the few days after that.

Q Okay. When did you first talk with Mr. Hickey?

A I believe he called me around the Labor Day weekend, maybe the Friday or -- I think it was the Friday of Labor Day weekend. So I think you told me the 11th was a Friday, so I would think it was probably September 3rd or 4th.

Q And was Mr. Hickey the first person that you talked to on behalf of Frost Buddy?

A I believe so.

Q Okay. When did you start billing in this matter?

A I don't know. But it was probably -- I don't know exactly, but it was probably around the time that I received a copy of the Holzen report.

Q And your rate is $845 an hour in that matter?

A Yes. That's what Epsilon Economics charges for my time.

Q And is that true regardless of the activity?

A For this year, for calendar year '26, yes.

Q Okay. Will that change in '27?

A Well, like I said, the profits -- the profits are those of Frost Buddy. The -- and then in rebutting -- responding to Mr. Holzen's royalty opinion, it was essentially the same approach that he took: Here's the sales of Frost Buddy. Here's a royalty rate.

I just had, you know, different inputs. My -- my understanding is that once you pay a license for something only one party in the chain has to pay that license. Now, whether the parties would figure out a way on the side to swipe that up, I don't know.

Q I would like to talk about some of the conversations that you had.

Let's start, I guess, with you said that you first talked to Mr. Hickey on September 3rd or 4th-ish?

A That sounds right. That sounds right.

Q Okay. How did that conversation arise? Who reached out to whom?

A He called me.

Q Okay. And he called you?

A He called me.

Q Okay. And did you answer on the first call?

A I don't recall.

Q Okay. What did you and Mr. Hickey talk about on that first call?

A This was two months ago, so I don't have a

perfect recollection of it. But I recall him introducing himself, saying that I had been recommended to him and could I work on this case with him. That's what I recall.

Q Him asking?

A Yes.

Q Okay. And what did you say?

A I probably said:

Thank you for the call. I'll get back to you.

Q Anything else?

A No. It was a very brief call.

Q Okay. Did you have another conversation with Mr. Hickey after that?

A Yes.

Q And what date was that?

A It was sometime around Labor Day, and I'm just trying to picture where I was.

I think he called back and said:

Hey, just following up.

Q Because you hadn't responded?

A Correct.

Q Okay. And so --

A Yeah. I had been away -- yeah, I had been away for the Labor Day weekend dealing with some family issues and, again, wasn't -- like wasn't really paying

attention to -- to my phone.
And when he called me back, he said:
Hey, just following up.
Q Okay. And did you answer or was that a voicemail?
A I recall speaking with him live. I don't remember whether he left a voicemail first or not, but I do remember speaking with him live. It may have been around the -- around Labor Day.
Q And what did you talk about on the second conversation you and Mr. Hickey had?
A I said:
Talk to Shutts & Bowen.
Q And Shutts & Bowen is a different company?
A My understanding is it's a law firm based in Florida.
Q And why did you tell him to talk to Shutts & Bowen?
A The -- I -- I believe that Mr. Hickey had been pointed to me originally from someone at Shutts & Bowen who I had recently finished a trial with; and after Mr. Hickey called me the first time, I had a conversation with the person from Shutts & Bowen about this case.
Q And who was the person at Shutts & Bowen that

you had a conversation about Mr. Hickey?

A His name is Woodrow Pollack, P-O-L-L-A-C-K.

Q And what was your conversation with Woodrow Pollack about this case?

A I said:

Well, thank you for recommending me to Mr. Hickey. He called me. We had a brief conversation. I understand that your firm is involved in this case.

So, you know, I thanked him again for the referral.

And I said:

Would it be an issue if you had an expert who had been -- who had had a brief conversation with the other side of this case?

And he said:

I'll get -- I'll call you back.

Q You asked Mr. Pollack that?

A Yes.

Q Why did you ask Mr. Pollack that?

A Because I wanted to know whether Shutts & Bowen and Frost Buddy would have an issue if I had had a brief introductory conversation with the other side but was not going to be retained.

Q And how did you know at that point that you were not going to be retained?

A At that point my family was going through some issues, and I wasn't entirely comfortable with the timing of the case for the September 17th deadline.

Q Did you have another conversation with Mr. Pollack after that?

A I don't recall having another conversation with him about this case.

Q So you expressed concern to Mr. Pollack that -- and you wanted guidance on that but never followed up with him?

A I wouldn't say expressed concern. I just wanted him to see if it was an issue, and I don't recall following up with him.

Q Did you talk to anyone else about this issue?

A Mr. Hickey.

Q When was the first time you told Mr. Hickey about a conversation with anyone on the other side of the "V"?

A I know I told him about it after I think it was October -- on October 16th when he received a letter from your law firm.

Q Okay. Not before that?

A I don't recall specifically telling him

anything about the issue before October 16th.

Q When -- or what is your understanding, if any, about what Mr. Pollack and Mr. Hickey talked about?

A I wasn't there, but at some point -- I'm assuming they talked. I guess I don't know. I'm assuming they talked, but I don't know.

Q Why are you assuming they talked?

A Because I talked to Mr. Hickey a few days later and he said: All good.

Q Did he say anything else?

A Not that I can recall.

Q And he didn't ask what conversations you had had with Grill Rescue?

A I'm trying to think. It's a little bit blurry. Like I said, I was kind of going through a family issue at the time. But I think I recall him asking me did I learn anything confidential or proprietary, to which I said no. And that was about it that I can recall.

Q So why then did you just tell me that October 16th was the first time that you discussed this issue with Mr. Hickey?

A Your question was did I tell him that I had been contacted by Fox Rothschild, and that was on October 16th, or at least that was my understanding of

your question.

Q So the distinction that you're making is that -- I guess I'm trying to understand.

So you -- you -- you said the first time that you told him was October 16th, but now you're also saying you just told him that you did not exchange confidential information. So help me understand what the distinction of these questions are that you're making.

A In the earlier call, he asked me some questions, and I answered them.

Q So you told him about conversations with Grill Rescue's team?

A He asked me about the conversation at a high level, and I gave him the high-level answer. But when I -- the first time I told him -- that I specifically told him was October 16th.

Q So what did he ask about the high-level conversations that were had?

A What I recall is he asked:

Did you -- did they tell you anything confidential or proprietary?

And I said:

No. That doesn't happen until we have a -- an engagement letter in place which

covers confidentiality.

Q Anything else?

A Not that I can recall, no.

Q And he didn't ask any specifics about the conversation to -- I guess I'll just -- he didn't ask any specifics about the conversation?

A Not that I can recall, no.

Q So there was no follow-up to ensure that the -- what was discussed was not confidential or proprietary?

MR. HICKEY: Objection, mischaracterizes testimony.

THE WITNESS: I'm not sure I understand your question. Could you -- could you say it again, please.

BY MR. TOFT:

Q Mr. Hickey didn't follow up to drill down and ensure that the conversations that you had with Grill Rescue did not rise to the disclosure of confidential information, correct?

A Again, I don't recall, you know, all the questions he asked me. I don't recall there being that many. There were some. But I don't recall much more than establishing that there was no confidential information, there was no confidential relationship,

there was no engagement letter obviously. I recall him asking me if I had notes from that, now that you mention it, and I said yes.

Q You have notes from what?

A The conversation which happened with Mr. Wolek and his associate in late August.

Q And have you provided those to counsel?

A I have not, no.

Q Will you provide -- do you have any objection to providing those today?

A I don't have them with me, but I can -- I can provide them.

Q Can you ask someone in the office to send them over kind of thing again?

A No. They're -- they're at home.

Q Okay. Did you take any notes during any of your -- sorry.

Let me -- prior to engagement with -- with Lewis Rice and Frost Buddy, how many calls in total did you exchange?

A So --

MR. HICKEY: Objection, form. And Luke, I'm not trying to be difficult. But calls with whom?

MR. TOFT: With Lewis Rice.

MR. HICKEY: Okay.

THE WITNESS: So there was the first call that we talked about. There was the second follow-up call we talked about. There was the third call that we talked about. That might be it.

BY MR. TOFT:

Q I don't know if we talked about the third call. What -- when did the third call take place?

A That was the one we were just talking about with -- where he asked me did I learn anything confidential or proprietary. That would have been -- I believe that was Labor Day-ish, so roughly September 6th or 7th.

Q Just so that my notes are clear, so Call No. 1 was around the 3rd or 4th of September?

A Yes.

Q And you said:

Let me get back to you?

A Yes.

Q Call No. 2 occurred when?

A That was when Mr. Hickey called and said:

Hey, just following up.

And I said:

Talk to Shutts & Bowen.

Q And that's all that was said?

A Yes.

Q And then the third call was this exchange of confidential information query?

A That was -- yeah, the next call was about a day or two later. It could've been the same day. Again, we were -- we were away as a family. So I'm trying to just place where I was. It was probably like the 6th or 7th, maybe.

Q During that third call where there was a query of information exchange, what else was discussed?

A I think it was basically:

We'd like to retain you. Could you have your team send us an engagement letter.

Q That's it?

A That's what I remember, yes.

Q So what did you know about the case at this time?

A I didn't know much. I had received the complaint.

Q From whom?

A I first received it in the middle of a phone call of that -- that brief introductory phone call that I had with Mr. Wolek and his associate, who I think his name was Brian. Brian sent the -- sent the complaint to me in the middle of our phone call.

Q And prior to your engagement, did you receive

the complaint again?
A It's likely, yes.
Q From whom?
A It would have been from Lewis Rice.
Q Okay. What other information had you received about this case?
A I think Mr. Hickey told me that he was working -- or he was retained on behalf of the Frost Buddy defendant and that's who Epsilon would be retained on behalf of but not the other two defendants. That's about it.
Q So you knew the complaints and which party you'd represent and no other additional information?
A Yeah. I read the complaint, you know, as is typical of my engagement when I get a complaint, and I was aware of which party was retaining my firm.
Q Prior to any retention, you don't typically have conversations about case strategy or assessment?
A No. Prior to retention it's typically:
Here's the parties. Here are the allegations. Here's what the -- what the statutes say.
And then sometimes I'll say, you know, I worked on a case similar, that sort of -- that sort of thing.

Q Did you tell Mr. Hickey you had worked on a case similar?
A I don't recall.
Q Did you tell Mr. Hickey anything else about your experience and how it would be relevant to this case?
A I believe that -- I guess I -- I personally don't recall in those conversations having that -- providing him that information. I may have. I just don't recall.
Q Did you take notes during any of those calls?
A No.
Q But you did --
A Like I said, I'm trying to -- I'm trying to place myself. I believe I was on a beach actually.
Q On all three calls?
A At least two of them, yes. It was all over that Labor Day weekend.
Q And how many emails were exchanged between yourself and anyone at Lewis Rice?
A At what point?
Q Prior to engagement.
A I recall Mr. Hickey sending me an email with his contact information. I recall Epsilon's -- Epsilon is my firm. I recall Epsilon's contracts team sending a

partially executed engagement letter to Mr. Hickey. That's all I'm aware of.

Q And the complaint, correct?

A I don't recall when we received the complaint.

Q So you are unsure if you received the complaint prior to engagement with -- from Lewis Rice at least?

A I'm unsure about the timing of that. And also, our conflicts team pulls up complaints from public dockets when an inquiry comes in. So I also could've received it that way too.

Q Talk to me about how the conflicts process at Epsilon works.

A Sure. What would you like to know?

Q Describe the process generally from start to finish as you understand it.

A Sure. So a call or email will come in typically from a law firm, but not always. And using whatever information is provided by the person who contacted me -- it's typically the parties to the litigation. Sometimes there's subject matter, sometimes not, the parties and then the -- most commonly the attorney who contacts me, that information will be entered into the conflict check system. The conflict check is run to see if Epsilon is working or has worked

A It rebuts his defendant's profits and reasonable royalty opinions in that he didn't consider what the factfinder may consider to be an appropriate time period for an award for what's sometimes referred to as a damages period. So it's rebutting -- it's rebutting his opinion that damages start in 2022 and go through and beyond -- and actually beyond today.

Q Do you offer an opinion on what a reasonable head start period would be in this case?

A Not separately and apart from what Mr. Rane told me.

Q You --

A And what's in his report.

Q You're adopting his analysis?

A I don't know that adopting his analysis is the way that I would think of it. I would think of it as I understand that a head start period is a period of time from when you learn something to when you can have a product, and his opinion is that it would be -- it can be quite quick, potentially as long as four months. And so I wouldn't say that I adopted his analysis. I've employed his up-to-four-month head start -- his four-month period as a head start damages calculation as an alternative to the factfinder.

Q Did you do any analysis yourself as to what an

appropriate head start would be?

A I corroborated it by looking at the Mammosers' experience.

Q So other than comparing Mr. Rane's opinion to the Mammosers' development of the Universal 1.0, is there any other analysis to determine a head start period?

A Well, like I said, I'm a mechanical engineer, and I know that companies -- having worked with many companies over the years, I know they reverse engineer competitors' products. But other than my -- other than, you know, what Mr. Rane says and my looking at Mammosers' and my, you know, experience from having been involved in cases over 27 years and having been an engineer before, that -- that's it.

Q So I just want to make sure that I'm clear about what it is that you're opining on.

A Sure.

Q Are you opining that the four-month head start is a reasonable head start period or are you using the head start that was provided to you?

A I'm using the head start period that was provided to me because of the other things that I mentioned, the Mammosers and -- and my experience that companies reverse engineer things, to -- to accept that

engagement letter does not have a confidentiality obligation; you were not under a confidentiality obligation, correct?

A That's my understanding, and that's the way it's been treated in depositions when I'm asked about it.

Q Okay. And when you talked to Fox Rothschild, you had calls with counsel at Fox Rothschild on August 27th and August 28th, correct?

A The 27th call was about a different matter than this matter. The 28th call was about this matter.

Q But you did have conversations with Fox Rothschild's counsel for Grill Rescue on the 27th and the 28th, correct?

A Yes, about two different cases.

Q But both for Grill Rescue?

A Yes.

Q And it's your position that on -- the Frost Buddy case was not discussed on the August 27th call?

A The extent of the discussion on the August 27th call was at the very end when we were basically hanging up.

And I said:

Oh, Adam, do you want to talk about the Frost Buddy case?

And he was like:
Yeah. Send me a Teams invite for tomorrow.
That was -- that was it.
Q And so your understanding or memory is that you did discuss Frost Buddy on August 28th?
A Only to the extent that I just said, that I said: Hey, do you want to talk about it?
And he said:
Yeah. Send me a calendar invite.
Q And this -- I've moved on to the second day, August 28th.
A Oh, the 28th, I'm sorry. I misunderstood you. Sorry. Go ahead.
Q And I think you testified earlier that call -- well, I guess how long was that call?
A Which one?
Q The August 28th call.
A It was no longer than a half hour because I had another call at 9:30.
Q So this was at nine in the morning?
A I believe it was nine and was over in time for me to make my 9:30 call.
Q Did anyone else, other than yourself and Fox Rothschild counsel, attend that call?

A Not that I can recall or am aware of.
Q No one else from Epsilon attended it?
A No.
Q Okay. And you took notes during that call?
A Yes.
Q Okay. Have you had success in getting those notes to counsel today?
A I told you they were at home.
Q Those are at home. Just out of curiosity, have you had success in getting the Oneida agreement?
A No. I -- I -- I have not. Alexis is knee-deep in something else right now, and I have not reached out to her.
Q Okay. Could you please do that at the next break?
A If you remind me right before the break, yes.
Q Okay. Without telling me what was said, I would like to get your understanding of what was discussed during the August 27th and 28th calls.
Sorry. I'm getting another phone call coming in.
Just with a yes-or-no response, on those calls did counsel for Rescue discuss Rescue's case strategy as to each defendant?
A No, not that I recall.

Q Did they include a conversation regarding the categories of damages that Remedy -- that Rescue intended to pursue?

A I don't know if it was what Rescue intended to pursue. I think it was more along the lines of in my experience and what does the -- what does the statute say.

Q What -- what -- what remedies were available to Rescue as options to pursue?

A That was my recollection, yes.

Q Okay. The strengths and weaknesses, as counsel saw it, of the case?

A No.

Q The strengths and weaknesses of different claims and damages in the case?

A No, not that I recall.

Q Any expert report strategy?

A No, not that I recall.

Q Procedural plans?

A I don't know what that means.

Q How procedural plans like as a for example -- I'm not trying to -- I wasn't on the call, so I don't know.

The -- you know, in this case, for instance, you can put yourself in front of the magistrate judge

instead of the district court judge. You could file motions to change the schedule. You could set the schedule in a different way, kind of those kind of procedural timing-wise issues.

A No. That doesn't sound familiar to me at all.

Q And --

A I mean schedule -- a scheduling order is pretty common. But that stuff you talked about, no.

Q Any assessment of the case overall?

A No, not that I recall.

Q And you said that you talked for 30 minutes?

A It was no more than 30 minutes. It was probably more like 25 would be my guess.

Q Okay. And your notes -- so let me -- if other notes contradict that, your position would be that they have misremembered the meeting?

A I don't know what they remembered. I know what I remembered and what I wrote down.

Q And your recollection -- or based on that, your position would be that if what you just told me is incorrect based on their notes those notes are incorrect? That's a bad question.

A Did you -- did you not hear what I just -- what I just said? I'm not sure you did. Did I break up? I mean I just told you I -- I remember what I

anyone on the other side of the "V" in that case?
A Retained, I would have probably seen a retention -- or a new case -- so no, I don't -- I don't think so.
Q So your report -- your received the Holzen report a few days after you sent an email to Mr. Wolek that said: Please remove me from consideration in this case, correct?
A A few days, yes.
Q And then your report rebuts the very damages theories that Mr. Holzen provides in his report, correct?
A My report is a rebuttal report to Mr. Holzen's report, yes.
Q And those were the defendant's specific damages that were options that were discussed during the call with counsel on August 28th, correct?
A Well, the -- we didn't talk about it in particular. We talked about what's available under the law and what I -- what I'm aware of under the law. So I think the statute specifies what the options are. I mean, Mr. Holzen's report includes a couple of options that are available under the law.
Q Did you discuss any of the allegations in the complaint that you received from Fox Rothschild during

the August 20th [sic] call?

A During the 28th?

Q Yeah.

A Yes. That's -- I believe that's why Brian sent me the complaint in the middle of the call because we wanted to go over the information in the complaint.

Q How do you separate what you learned about this case on those calls with Fox Rothschild from what you learned from Frost Buddy?

A It's -- I mean Frost Buddy I talked about the things with Mitch and Brock Mammoser and Keagan Boll. In the call with Fox Rothschild, we talked about the -- the information in the complaint and the allegations, what's available under the law, which, of course, is listed in the complaint in the -- or the prayer for relief at the end and the schedule, which is public info. So...

Q You've done -- your report includes damages theories under a disgorgement theory, right?

A What I don't recall is if it's called damages or monetary relief, but yeah, there's a -- like a defendant's profits rebuttal.

Q What distinction, if any, should I understand from your use of "monetary relief" as opposed to damages?

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

________________________________

GRILL RESCUE LLC D/B/A RESCUE LLC,

Plaintiff,

v.

SHENZHEN REEKOOS HOUSEWARE CO LTD; FROST BUDDY, LLC; and WEILIANG GU,

Defendants.

Case No. 9:26-cv-80481-DMM

________________________________

VIDEOTAPED DEPOSITION OF STEPHEN ANDREW HOLZEN

DATE: Tuesday, October 13, 2026

TIME: 9:07 a.m.

LOCATION: Epstein Becker & Green, P.C.
1227 25th Street Northwest, Suite 700
Washington, DC 20037

REPORTED BY: Olivia Thompson

JOB NO.: 8472732

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF GRILL RESCUE LLC D/B/A RESCUE LLC:

LUKAS TOFT, ESQUIRE
Fox Rothschild
City Center, 33 South Sixth Street, Suite 3600
Minneapolis, MN 55402
ltoft@foxrothschild.com
(612) 607-7336

ON BEHALF OF DEFENDANTS WEILIANG GU AND SHENZHEN REEKOOS HOUSEWARE CO LTD:

ALEXANDER F. ROJAS, ESQUIRE (by videoconference)
RojasLaw
201 South Biscayne Boulevard, 28th Floor
Miami, FL 33131
arojas@rojaslawfirm.com
(212) 686-3838

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANT FROST BUDDY, LLC:

MICHAEL HICKEY, ESQUIRE
Pro Hac Vice, Lewis Rice LLC
600 Washington Avenue, Suite 2500
Saint Louis, MO 63101
mhickey@lewisrice.com
(314) 444-7600

ALSO PRESENT:

Warren Brey, Legal Eye Media Videographer

I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Hickey | 7 |
| By Mr. Toft | 253 |
| By Mr. Hickey | 254 |


E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| | (None marked.) | |

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 14 | 11 |
| 71 | 11 |

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We're going on the record at 9:07 a.m. EST on October 13, 2026. This is media unit 1 of the -- the video recorded deposition of Stephen A. Holzen taken by counsel for the defendant in the matter of Grill Rescue LLC vs. Shenzhen Reekoos Houseware Company LTD et al. filed in the District Court -- District of Florida, West Palm Beach Division, case number 9:26-cv-80481-DMM.

My name is Warren Brey representing Veritext Legal Solutions. I'm the videographer. The court reporter is Olivia Thompson from the firm of Veritext Legal Solutions.

Counsel, please introduce yourselves for the record.

MR. HICKEY: Michael Hickey for defendant Frost Buddy, LLC.

MR. TOFT: Luke Toft with Fox Rothschild for plaintiff Grill Rescue.

MR. ROJAS: Good morning. This is Alex Rojas of RojasLaw appearing for defendants Shenzhen

Reekoos and Gu. And if I could get a reservation on the record real quick, Defendants Reekoos and Gu have moved to dismiss for insufficient service of process and that's pending.

We're appearing here, participating here only to protect our clients' defensive interests and are not making any sort of attempt at affirmative relief by participating here. So I just want to put that in the record and make sure it's clear that we're not waiving anything or consenting to service by appearing here. Thanks.

THE VIDEOGRAPHER: Can the court reporter please swear in the witness?

THE REPORTER: Yes. And before I do, I must read a stipulation of my own.

I am a notary authorized to take acknowledgements and administer oaths in District of Columbia. Absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted

under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

If there is no objection, please raise your right hand.

WHEREUPON,

STEPHEN ANDREW HOLZEN,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: You may proceed.

EXAMINATION

BY MR. HICKEY:

Q Good morning. Could you please state your full name for the record?

A Good morning. Stephen Andrew Holzen.

Q Okay. And Mr. Holzen, are you employed?

A I am.

Q Who are you employed by?

expert report you were contacted by Fox Rothschild?
A Not with any precision.
Q Approximately how long before your expert report was due were you contacted by Fox Rothschild?
A It could've been -- it's certainly within the six months before the report was filed. Maybe within three months before the report was filed.
Q When were -- when was Stout retained with an engagement letter?
A Also, I don't know with any precision. But the way to answer that is to just look at the date that it was signed.
Q Okay. And was that letter -- engagement letter signed in August of 2026?
A I'd have to look at the engagement letter.
Q All right. You don't recall if it was signed in September of 2026?
A I do not recall.
Q Okay. Did you feel like you had enough time to complete your report?
A I had sufficient time to complete my report.
Q So you asked for all the documents that had

MR. HICKEY: Do you want to ask --

THE REPORTER: Oh. I'm -- I apologize. Yes.

Attorney Rojas, would you like to order a copy of today's transcript?

MR. ROJAS: We'll hold off at this time. Thank you.

THE REPORTER: Okay. No problem.

THE VIDEOGRAPHER: We're now off the record at 4:23 p.m.

(Signature waived.)

(Whereupon, at 4:23 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, OLIVIA THOMPSON, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

OLIVIA THOMPSON
Notary Public in and for the
District of Columbia

CERTIFICATE OF TRANSCRIBER

I, MILIRA GARDNER, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



MILIRA GARDNER

**GRILL RESCUE LLC D/B/A RESCUE LLC**
**v.**

**SHENZHEN REEKOOS HOUSEWARE CO. LTD; WEILIANG GU; AND FROST BUDDY, LLC**

**U.S.D.C. S.D. Fla. Civil Action No. 9:26-cv-80481-DMM**

**Acknowledgement and Errata of Deponent**

I reviewed the transcript of my deposition taken on October 13, 2026, in the above case, and the transcription is correct, except that I note the following corrections and changes:

| PAGE NO. | LINE NO. | CHANGE FROM | CHANGE TO | REASONS FOR MAKING THE CHANGES |
|---|---|---|---|---|
| 27 | 4 | Manufacturer | Manufacture | Transcription error |
| 30 | 7 | Dylan’s | Dillon’s | Transcription error |
| 30 | 22 | Site checking | Cite checking | Transcription error |
| 31 | 4 | Site checks | Cite checks | Transcription error |
| 84 | 13 | Perhaps you sales | Perhaps unit sales | Transcription error |
| 88 | 14 | Wholesome view | Holistic view | Transcription error |
| 90 | 3 | Ssessment | Assessment | Transcription error |
| 90 | 8 | Convoy | Convoyed | Transcription error |
| 90 | 11 | The revenues of the profits | The revenues or the profits | Transcription error |
| 90 | 21 | Convoy | Convoyed | Transcription error |
| 93 | 2 | Naybe | Maybe | Transcription error |
| 93 | 4 | Convoy | Convoyed | Transcription error |
| 91 | 11 | Convoy | Convoyed | Transcription error |
| 93 | 14 | Convoy | Convoyed | Transcription error |
| 91 | 16 | Convoy | Convoyed | Transcription error |
| 95 | 2 | Convoy | Convoyed | Transcription error |
| 95 | 12 | Convoy | Convoyed | Transcription error |
| 121 | 5 | Had start advantage | Head start advantage | Transcription error |
| 152 | 8 | Were | Where | Transcription error |
| 153 | 15 | Their competitors | They’re competitors | Transcription error |
| 176 | 11 | The data for sale will mark the beginning | The date of sale will mark the beginning | Transcription error |
| 174 | 16-17 | Prove up to elements of cost | Prove up the elements of cost | Transcription error |
| 177 | 9 | Ipsio [ph] | IPSCIO | Transcription error |
| 179 | 13 | Profit margins aren’t in | Profit margins are at a net | Transcription error |

| PAGE NO. | LINE NO. | CHANGE FROM | CHANGE TO | REASONS FOR MAKING THE CHANGES |
|---|---|---|---|---|
| | | net level | level | |
| 183 | 5 | JFE region | JFET Region | Transcription error |
| 183 | 5 | p-well | P-well | Transcription error |
| 204 | 4 | For use and trade secret cases | For use in trade secret cases | Transcription error |
| 204 | 6 | Identified five cases | Identified five factors | Transcription error |
| 211 | 16 | IPSIO [ph] | IPSCIO | Transcription error |
| 217 | 1 | IPSIO [ph] | IPSCIO | Transcription error |
| 217 | 16 | 6-96 | 6-94 | Transcription error |
| 220 | 20-21 | Licensing executive society | Licensing Executives Society | Transcription error |
| 219 | 10 | Royalty source | RoyaltySource | Transcription error |
| 219 | 11 | Royalty source | RoyaltySource | Transcription error |
| 221 | 20 | IPSIO [ph] | IPSCIO | Transcription error |
| 229 | 11 | Took the leading | Took the lead | Transcription error |
| 236 | 5 | Solve a product | Solve a problem | Transcription error |
| 258 | 19-20 | Lost sales from lost profits | Lost profits from lost sales | Transcription error |
| | | | | |

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Stephen Holzen

Stephen Holzen

November 13, 2026

Date